IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Continental Resources, Inc. an Oklahoma corporation, | ) ) ) | |
| Plaintiff, | ) ) | **ORDER GRANTING THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| vs. | ) ) ) | |
| North Dakota Board of University and School Lands and the United States of America, | ) ) ) ) | Case No. 1:17-cv-014 |
| Defendants, | ) ) | |

Before the Court are motions for partial summary judgment filed by both defendants on May 7, 2020. See Doc. Nos. 81 and 83. The motions have been fully briefed and are ripe for consideration. See Doc. Nos. 82, 84, 85, 87, 88, and 89. For the reasons set forth below, the United States' motion for partial summary judgment is granted and the Land Board's motion for partial summary judgment is denied.

I. **BACKGROUND**

This dispute stems from competing claims of mineral ownership due to disagreement as to where the historic ordinary high-water mark ("OHWM") of the Missouri River is located. In late 2016, Continental Resources Inc. ("Continental Resources") brought this interpleader action against the North Dakota Board of University and School Lands ("Land Board") and the United States in the District Court of McKenzie County, Northwest Judicial District, North Dakota. Continental Resources is an oil and gas production company that leases minerals in western North Dakota from both North Dakota and the United States. The Land Board consists of the

1

North Dakota Governor, Secretary of State, Superintendent of Public Instruction, Treasurer, and Attorney General.  It is charged with, among other things, managing North Dakota's minerals underlying sovereign lands.  Continental Resources requested the state court order North Dakota and the United States to interplead their respective claims to royalties from the production of minerals on lands which each claim to own and have issued leases with overlapping acreage.  The disputed minerals are described in an exhibit attached to Continental Resources' amended complaint.  See Doc. No. 27-1.  The United States removed the action to this Court on January 11, 2017.  More than three (3) million dollars in royalties are at stake and the royalties continue to accrue.  Continental Resources does not claim an interest in any of the royalties.  It brings this interpleader action simply to avoid being subject to duplicate liability for royalty obligations attributable to the disputed lands.  Continental Resources is holding the disputed royalties in escrow at the direction of the Court, pending a final determination on the merits.

      The Missouri River in North Dakota is a navigable river.  In 1889, North Dakota was admitted to the Union and acquired title, pursuant to the equal footing doctrine, to the bed of the Missouri River, including the underlying minerals, up to the OHWM.  To document the location of the Missouri River's OHWM, and thus delineate the boundary between state-owned riverbed and federally-owned uplands, the General Land Office (predecessor to the Bureau of Land Management "BLM") prepared and filed cadastral surveys between 1891 and 1901, using the Manual of Surveying Instructions in effect at the time.  The meander line identified in these surveys marked the OHWM at the time.

      Rivers, especially large navigable rivers, such as the Missouri, are dynamic.  They change course through erosion, accretion, and avulsion, and when they do, the OHWM changes

as well.  Rivers also flood.  Missouri River flooding was particularly bad in the first half of the twentieth century.  So it was that Congress passed the Flood Control Act of 1944, which authorized the United States Army Corps of Engineers ("Corps") to construct the Garrison Dam on the main stem of the Missouri River in North Dakota as part of the Pick-Sloan Missouri basin project dams.  Several other dams along the Missouri River were constructed as well.  The waters impounded by the Garrison Dam created Lake Sakakawea, one of the largest reservoirs in the United States.  Garrison Dam was completed in 1953.  Once the dam was completed and Lake Sakakawea began to form, the portion of the Missouri River underlying Lake Sakakawea ceased its wanderings and the OHWM became fixed.  This fixed, but hotly contested, OHWM is known as the historic OHWM.

By the time construction of Garrison Dam got underway, many of the uplands that would be inundated by Lake Sakakawea had been patented and passed from the federal public domain to private landowners.  Before the dam was constructed, the Corps surveyed the privately-owned land which was expected to be inundated and would need to be acquired by the United States.  The resulting survey maps are known as the "Corps Segment Maps."  The Corps Segment Maps depict the riverbed and OHWM as it existed in 1952.  Where the Corps was able to acquire the privately-owned lands that it needed through a voluntary sale, it allowed the landowners to reserve the underlying minerals.  Where the Corps was forced to rely on the power of eminent domain, however, it acquired both the surface estate and the associated mineral estate.  These lands which were acquired by the United States from private parties are referred to as "acquired lands."

Not all the land inundated by Lake Sakakawea was owned by private parties. Some of the land was owned by the United States. At the time, the United States still held title to public domain uplands above the historic OHWM of the Missouri River that had never left the possession of the United States since they were acquired from France in 1803. These lands, which have never been patented or left federal ownership, are referred to as "retained public domain lands." As a result, the surface estate of the former uplands now submerged by Lake Sakakawea is owned by the United States and consists of a mix of "retained public domain lands" and "acquired lands." The mineral estate in those former uplands consists of a mix of retained public domain mineral interests and acquired mineral interests which belong to the United States and mineral interests that remain in private ownership.

Prior to the Bakken oil boom which began around 2005, the exact location of the submerged riverbed was a question of only historical significance. However, with the advent of modern oil and gas drilling technology, and Lake Sakakawea's location in the Bakken oil fields, the submerged riverbed's historic OHWM has taken on new importance. The United States owns now submerged lands upland of the historic OHWM of the Missouri River. Its interests extend down to the historic OHWM. Pursuant to the eqaul footing doctrine, North Dakota owns the riverbed, including the mineral estate, up to the historic OHWM. With the United States and North Dakota at odds over the location of the historic OHWM, more surveys were conducted.

In 2010, the Land Board hired a private engineering firm, Bartlett & West, to conduct a survey of the Missouri River. The final report was completed in 2011.[1] Bartlett & West conducted its analysis in compliance with Ordinary High Water Mark Delineation Guidelines

---

[1] The Bartlett & West report is available at:
https://www.land.nd.gov/sites/www/files/documents/Minerals/OHWM2/ohwm%20report.pdf.

issued by the North Dakota State Engineer in 2007. The study did not utilize the Corps Segment Maps. Since completion of the Bartlett & West study, the Land Board has leased North Dakota's mineral interests underlying the bed of the Missouri River consistent with the study's determination of the historic OHWM. Prior to the Bartlett & West study, North Dakota's minerals were leased based upon aerial photographs and ground surveys.

In 2013, the BLM prepared Supplemental Plats of the retained public domain lands in the vicinity of Lake Sakakawea to account for the movement of the Missouri River between the original cadastral surveys conducted in the late nineteenth and early twentieth centuries and the impoundment of Lake Sakakawea in the 1950s. The Supplemental Plats do not show the boundary between state-owned riverbed and any other riparian property, whether privately held or federally acquired. The BLM determined the Corps Segment Maps were the most comprehensive evidence of the Missouri River's location just prior to impoundment. The Supplemental Plats were created by overlaying the Corps Segment Maps on the original turn of the century surveys. The Supplemental Plats show the official position of the United States as to the historic OHWM of the Missouri River prior to the formation of Lake Sakakawea. The Supplemental Plats show the boundary between the now submerged federal public domain uplands and State riverbed along portions of the Missouri River in North Dakota. The BLM published the Supplemental Plats in late 2013 and early 2014. North Dakota protested the Supplemental Plats because the BLM applied federal law rather than state law in making its OHWM determination. The State contended the application of federal law led to an inaccurate OHWM boundary in the Supplemental Plats which resulted in some lands being shown as federally-owned uplands above the OHWM rather than state-owned riverbed below the OHWM.

The BLM rejected the protest. North Dakota appealed. The Interior Board of Land Appeals rejected North Dakota's appeal, finding "[f]ederal law applies to BLM's determination of the OHWM along retained Federal riparian property, and state law should not be borrowed." 195 IBLA 194, 216 (March 25, 2020). This determination meant the boundary between state and federal lands would be determined as shown in the Supplemental Plats.

In April 2017, following the filing of this action and while the IBLA proceeding was pending, North Dakota enacted Chapter 61-33.1 of the North Dakota Century Code to address state ownership of the bed of the Missouri River. In litigation with private mineral owners regarding lands whose surface estate had previously been sold to the United States to construct the Garrison Dam, the Land Board claimed "title to the bed of the Missouri River up to the current ordinary high water mark." See Wilkinson v. Bd. of Univ. & School Lands, 903 N.W.2d 51, 54 (N.D. 2017) ("Wilkinson I") (emphasis added). Chapter 61-33.1 rejected this view and made clear that "state sovereign land mineral ownership of the riverbed segments subject to inundation by Pick-Sloan Missouri basin project dams extends only to the historical Missouri riverbed channel up to the ordinary high water mark." N.D.C.C. § 61-33.1-02 (emphasis added); see also N.D.C.C. § 61-33.1-01 (defining "[h]istorical Missouri riverbed channel" as the riverbed as it existed when the Pick-Sloan Plan dams were closed to begin impounding the Missouri River).

Section 61-33.1-03(1) provided that, for lands other than non-patented public domain lands, BLM's Supplemental Plats "must be considered the presumptive determination of the ordinary high water mark of the historical Missouri riverbed channel," subject to a review process set forth in the statute. N.D.C.C. § 61-33.1-03(1); see also N.D.C.C. § 61.33.1-01

("'Corps survey' means the last known survey conducted by the army corps of engineers in connection with the corps' determination of the amount of land acquired by the corps for the impoundment of Lake Sakakawea and Lake Oahe, as supplemented by the supplemental plats created by the branch of cadastral survey of the United States bureau of land management"). For "nonpatented public domain lands" owned by the United States, on the other hand, the OHWM of the historic Missouri River on these lands "must be determined by the branch of cadastral study of the United States bureau of land management in accordance with federal law." N.D.C.C. § 61-33.1-06. Chapter 61-33.1 is retroactive to the date of the closure of the Pick-Sloan dams save for the OHWM determination which is retroactive to all oil and gas wells spud after January 1, 2006, for purposes of oil and gas mineral and royalty ownership. 2017 N.D. Sess. Laws Ch. 426, § 4. The Legislature appropriated $100 million for refunds and authorized an $87 million line of credit with the Bank of North Dakota if the initial appropriation was insufficient. 2017 N.D. Sess. Laws Ch. 426, § 3.

In Chapter 61-33.1, the North Dakota Legislature commissioned an additional study. See N.D.C.C. § 61-33.1-03. The report was completed by Wenck Associates, Inc. in 2018.[2] The Wenck Report determination of the OHWM was made in accordance with the parameters set forth in the enabling legislation. See N.D.C.C. § 61-33.1-03(3). The Bartlett & West Report OHWM determination is favorable to North Dakota, while the OHWM determination in the Supplemental Plats favor the United States. The Wenck Report occupies the middle ground between the Bartlett & West Report and the Supplemental Plats in its determination of the OHWM. Thus, it would seem determination of the OHWM is more art than science.

---

[2]The Wenck Report is available at:
https://www.dmr.nd.gov/OrdinaryHighWaterMark/docs/2018-10-03_Amended_Final_OHWM_Report.pdf

7

Chapter 61-33.1 proved controversial. In January of 2018, a group of taxpayers challenged the law, contending it was unconstitutional. The plaintiffs' complaint alleged that Chapter 61-33.1 "unconstitutionally gives away State-owned mineral interests to 108,000 acres underneath the OHWM of the Missouri River/Lake Sakakawea, and above the Historic OHWM and gives away over $205 million in payments, in violation of the Constitution of the State of North Dakota." Sorum v. State, 947 N.W.2d 382, 388 (N.D. 2020). On July 30, 2020, the North Dakota Supreme Court issued an opinion finding Chapter 61-33.1 did not violate the North Dakota constitution's gift clause, watercourses clause, privileges or immunities clause, the local and special laws prohibition, and the public trust doctrine. Id. at 390-400 (noting the State recognized in Chapter 61-33.1 that it had an obligation to pay its debts and deal fairly with its citizens). On August 27, 2020, the North Dakota Supreme Court in *Wilkinson v. Bd. of Univ. & School Lands*, 947 N.W.2d 910, 920-21 (N.D. 2020) ("Wilkinson II") found Chapter 61-33.1 was not ambiguous and applied to the land in question which was above the OHWM of the historical Missouri riverbed channel and was not state sovereign lands. The case was remanded to the state district court for a determination of damages on the royalties the state had unfairly claimed. Id. at 920. *Sorum* and *Wilkinson II* were decided after the briefing on the current motions was completed.

II.     **STANDARD OF REVIEW**

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, 490 F.3d 648,

654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id. The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(c)(1).  If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate.  Matsushita, 475 U.S. at 587.

### III.   LEGAL DISCUSSION

The pending motions for partial summary judgment present two closely related issues as to the disputed nonpatented public domain lands: (1) the first issue is whether state or federal law governs the determination of the historical OHWM; (2) the second issue is the application of

N.D.C.C. § 61-33.1-06 to the disputed lands. Acquired lands are not at issue in the current motions. The Court will address each question in turn.

### A.     CHOICE OF LAW

The United States contends federal law must be applied in order to determine the OHWM of the historic Missouri River abutting public domain lands. Applying federal law will result in the adoption of the historic OHWM as determined by the Supplemental Plats. The Land Board agrees federal law governs the determination, but contends federal law borrows state law as the rule of decision.

Under the equal footing doctrine, upon statehood, States acquire absolute title "to the beds of waters then navigable" within their borders. See PPL Montana, LLC v. Montana, 565 U.S. 576, 591 (2012). Such was the rule for the thirteen original States and all subsequent States as coequals under the Constitution. Id. All States hold "absolute right to all their navigable waters and the soils under them." Id. at 590. State title to these lands is "conferred not by Congress but by the Constitution itself." Id. at 591. Since title is conferred to the States by the Constitution itself, no Congressional land grant to a third party can defeat State title. Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 374 (1977). The initial boundary between the riverbed and the uplands is determined by federal law. Id. at 370-71. "[T]hereafter the role of the equal-footing doctrine is ended, and the land is subject to the laws of the State" "unless there were present some other principle of federal law requiring state law to be displaced." Id. at 376, 371. This general rule from *Corvallis* does not apply where the "United States has never yielded title or terminated its interest." Wilson v. Omaha Indian Tribe, 442 U.S.

10

653, 670 (1979). Thus, federal law must be applied in this case as the land in question has never been patented.

However, "[c]ontroversies governed by federal law do not inevitably require resort to uniform federal rules. It may be determined as a matter of choice of law that, although federal law should govern a given question, state law should be borrowed and applied as the federal rule for deciding the substantive legal dispute at hand." California ex rel. State Lands Comm'n v. United States, 457 U.S. 273, 283 (1982) (citations omitted). "Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" Wilson, 442 U.S. at 672 (quoting United States v. Kimbell Foods, Inc., 440 U.S. 715, 727-28 (1979)).

The United States contends *PPL Montana* rather than *Wilson* should control the Court's analysis. The Court finds the contention unpersuasive. The United States cites *PPL Montana* for the proposition that a State may not adopt a retroactive rule for determining navigability and then attempt to extend the rule to OHWM determinations. *PPL Montana* involved a question of whether certain sections of the Missouri River were navigable and thus were acquired by Montana under the equal footing doctrine when it joined the Union in 1889. 565 U.S. at 590-91. This question was answered by applying the "navigability in fact" rule. Id. at 591. Navigability is determined as of the time of statehood. Id. at 592. *PPL Montana* was decided in 2012. It does not address boundary issues or how the OHWM is determined. *PPL Montana* makes no mention of *Wilson*, or *California ex rel. State Lands Comm'n* which were decided well before *PPL Montana*. While both navigability and the OHWM are aspects of the equal footing

doctrine, the two determinations are made by applying completely divergent tests and law. The Court is unwilling to ignore *Wilson*. *PPL Montana* has little to offer in assessing the question presented in this case as to what law should be applied to new OHWM boundaries created well after statehood by a meandering Missouri River.

In *Wilson*, the United States and the Omaha Indian tribe sued to quiet title to reservation lands which had been affected by the movement of the Missouri River where it bordered Iowa and Nebraska. 422 U.S. at 658-59. The critical question was whether federal or state law should be applied to determine whether changes in the course of the Missouri River were accretive or avulsive. Id. at 658. The Supreme Court held federal law must apply because the land in question had never been patented by the United States. Id. at 670-71. If the land hand been granted to private owners state law would apply. Id. However, this determination did not end the Court's inquiry because federal law sometimes borrows state law as the rule of decision. Id. at 672. Factors to consider include "whether there is need for a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy or functions, and the impact a federal rule might have on existing relationships under state law." Id. at 672-73. Applying these factors, the Supreme Court in *Wilson* determined state law should be borrowed as the rule of decision. The Supreme Court explained that state law should be borrowed because a uniform federal rule was not required, federal court jurisdiction over such questions insured fair treatment of federal interests, and applying federal law would interfere with the substantial interests States have in applying their own law to resolve land disputes. Id. at 673-75.

In *California ex rel. State Lands Comm'n,* the Supreme Court faced another choice of law riparian boundary dispute. 457 U.S. 273. The case involved a suit by California to quiet title in oceanfront land created by accretion to land owned by the United States. Id. at 275. The central issue was whether state or federal law governed the determination. Id. The construction of two jetties and resulting accretion had caused one hundred eighty-four acres of upland to be created by the seaward movement of the OHWM of the Pacific Ocean. Id. at 275-76. Citing *Wilson*, the Supreme Court found federal law applied because the case involved land "where title rests with or was derived from" the United States. Id. at 283. The Supreme Court went on to hold that the case was not one where state law should be borrowed as the rule of decision because a federal statute controlled the determination. Id. at 283. The Supreme Court explained that a provision of the federal Submerged Lands Act withholding accretions to coastal lands from grants to the States meant "borrowing for federal-law purposes a state rule that would divest federal ownership is foreclosed." Id. at 283-84. *Wilson* was distinguished because that case involved "no special federal concerns, let alone a statutory directive," which required a federal common-law rule. Id. at 284.

It is undisputed federal law governs this dispute. However, this finding does not end the Court's inquiry because as noted in *Wilson*, federal law sometimes borrows state law as the rule of decision. The Court concludes *Wilson* and the application of the three factors discussed therein, must then guide the Court's analysis of whether state law should be borrowed as the rule of decision in this case. See 195 IBLA 194, 210 (March 25, 2020) (applying *Wilson*).

Navigable rivers change course and when they do so the OHWM moves as well. The question is what law applies to determine the new OHWM. The present case and *Wilson* are

very similar. Both cases involve land which never left federal ownership and was affected by the movement of the Missouri River. The lands in *Wilson* were held in trust for an Indian tribe but otherwise *Wilson* and the present case are remarkably similar. Neither case involves an interstate boundary.

> In *Wilson,* the Supreme Court analyzed the three relevant factors as follows:
>
> First, we perceive no need for a uniform national rule to determine whether changes in the course of a river affecting riparian land owned or possessed by the United States or by an Indian tribe have been avulsive or accretive. For this purpose, we see little reason why federal interests should not be treated under the same rules of property that apply to private persons holding property in the same area by virtue of state, rather than federal, law. It is true that States may differ among themselves with respect to the rules that will identify and distinguish between avulsions and accretions, but as long as the applicable standard is applied, evenhandedly to particular disputes, we discern no imperative need to develop a general body of federal common law to decide cases such as this, where an interstate boundary is not in dispute. We should not accept generalized pleas for uniformity as substitutes for concrete evidence that adopting state law would adversely affect federal interests.
>
> Furthermore, given equitable application of state law, there is little likelihood of injury to federal trust responsibilities or to tribal possessory interests. On some occasions, Indian tribes may lose some land because of the application of a particular state rule of accretion and avulsion, but it is as likely on other occasions that the tribe will stand to gain. The same would be the case under a federal rule, including the rule that the Court of Appeals announced in this case. The United States fears a hostile and unfavorable treatment at the hands of state law, but, as we have said, the legal issues are federal and the federal courts will have jurisdiction to hear them. Adequate means are thus available to insure fair treatment of tribal and federal interests.
>
> This is also an area in which the States have substantial interest in having their own law resolve controversies such as these. Private landowners rely on state real property law when purchasing real property, whether riparian land or not. There is considerable merit in not having the reasonable expectations of these private landowners upset by the vagaries of being located adjacent to or across from Indian reservations or other property in which the United States has a substantial interest. Borrowing state law will also avoid arriving at one answer to the avulsive-accretion riddle in disputes involving Indians on one side and possibly quite different answers with respect to neighboring land where non-Indians are

>the disputants. Indeed, in this case several hundred acres of land within the Barrett survey are held in fee, and concededly are not Indian property. These tracts would not be governed by the federal rule announced by the Court of Appeals.

Wilson, 442 U.S. at 673–74 (internal citations and quotations omitted).

The Court sees no reason why this reasoning should not apply in this case as well. The United States has failed to identify a need for a uniform federal law in the determination of the OHWM. The fact that federal rules exist for a determination of the OHWM does not identify a need for them to be applied. Applying state law would allow for land owners to be treated equally under uniform law. It is only once a river has migrated from its initial course that the OHWM must again be determined. It is certainly possible that rules adopted by either sovereign involved could work to the detriment of the other. But since the federal courts would have jurisdiction over any dispute, federal interests are protected. Fair treatment and impartial application of the applicable rules, whether state or federal, is what *Wilson* requires. States have significant interests at stake when it comes to determining real property boundary disputes. Determining the OHWM does not affect title but is simply a matter of finding boundaries. Generalized concerns of unfair treatment under state law do not trump historic interests of the States in having their own law apply to property disputes. Wilson, 442 U.S. at 674. The only well articulated argument the United States has for applying federal law is a generalized fear of unfair treatment. This generalized fear argument, which *Wilson* rejects, is why the Court finds the Interior Board of Land Appeals treatment of the issue unpersuasive. 195 IBLA 194, 216 (March 25, 2020) (noting a state could adopt a more expansive interpretation of the OHWM to the detriment of federal interests). In this case, that fear is completely unfounded as state law defers to federal law insofar as far as non-patented public domain lands are concerned. If the

land in question was owned by private parties rather than the United States, state law would apply to make the OHWM determination. Why then should state law not be borrowed to provide the rule of decision in this case? Should the United States ever decide to patent the land in question, state law would apply to determine the location of the OHWM. Finding no need for a uniform federal law in this area and based on its reading of *Wilson*, the Court concludes state law should be borrowed as the rule of decision in this case.

B.  **N.D.C.C. § 61-33.1-06**

Having determined that federal law then looks to state law for the rule of decision in this case, the Court turns to N.D.C.C. § 61-33.1-06, the meaning of which is vigorously disputed. Section 61-33.1-06 of the North Dakota Century Code provides as follows:

> Notwithstanding any provision of this chapter to the contrary, the ordinary high water mark of the historical Missouri riverbed channel abutting nonpatented public domain lands owned by the United States must be determined by the branch of cadastral study of the United States bureau of land management in accordance with <u>federal law</u>.

N.D.C.C. § 61-33.1-06 (emphasis added).

The United States maintains this statutory provision requires the application of federal law to the disputed public domain lands. The Land Board contends the federal law referenced in the statute borrows state criteria and the law violates the North Dakota constitution.[3]

Passed in 2017, the law went into effect on April 21, 2017. The BLM published the Supplemental Plats in 2013 and 2014. The Legislature referenced the Supplemental Plats in its definition of "Corps survey" in Section 61-33.1-01. See N.D.C.C. § 61-33.1-01 (defining

---

[3] The State and the Land Board in *Sorum* took the position that Chapter 61-33.1 was constitutional in all regards under North Dakota's gift clause, water-course clause, privileges or immunities clause, and the local or special laws prohibition.

"Corps survey" to mean the Corps Segment Maps "as supplemented by the supplemental plats created by the branch of cadastral survey of the United States bureau of land management"). Clearly, the North Dakota Legislature was aware of these Supplemental Plats when it passed the law. By providing that the OHWM was to "be determined by the branch of cadastral study of the United States in accordance with federal law," North Dakota state law adopted the OHWM determination in the Supplemental Plats as to the nonpatented public domain lands.

The Land Board's contentions otherwise are unpersuasive. The North Dakota Supreme Court has clearly determined Section 61-33.1-06 does not violate North Dakota law or the North Dakota constitution. Sorum, 947 N.W.2d at 396-400 (finding no violation of the gift clause, watercourse clause, privileges and immunities clause, the special laws prohibition, and the public trust doctrine). The suggestion that the North Dakota Legislature meant state law when it said federal law violates basic concepts of statutory interpretation which require the language in an unambiguous statute to be given its plain and ordinary meaning. Wilkinson II, 947 N.W.2d at 918. The North Dakota Supreme Court has expressly stated "Chapter 61-33.1, N.D.C.C. is not ambiguous." Id. at 921. The Court finds nothing ambiguous about the phrase "federal law." The Court concludes that when the North Dakota Legislature said federal law it meant federal law. Id. at 920 (noting "it must be presumed the legislator intended all that it said, said all that it intended to say, and meant what it has plainly expressed"). Otherwise the statute would be meaningless. Therefore, pursuant to Section 61-33.1-06, the OHWM determination as to the disputed non-patented public domain lands must be determined by federal law, that being the Supplemental Plats.

IV.     **CONCLUSION**

Accordingly, the United States' motion for partial summary judgment (Doc No. 81) is **GRANTED** and the Land Board's motion for partial summary judgment (Doc. No. 83) is **DENIED**. The Court **ORDERS** and **DECLARES** the royalties on the non-patented public domain lands in dispute must be distributed based upon the determination of the historic OHWM as set forth in the BLM's Supplemental Plats.

**IT IS SO ORDERED**.

Dated this 8th day of December, 2020.

>*/s/ Daniel L. Hovland*
>Daniel L. Hovland, District Judge
>United States District Court