**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Continental Resources, Inc. | ) | |
| an Oklahoma corporation, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING THE LAND** |
| | ) | **BOARD'S' MOTION FOR PARTIAL** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| North Dakota Board of University | ) | |
| and School Lands and the United | ) | |
| States of America, | ) | Case No. 1:17-cv-014 |
| | ) | |
| Defendants. | ) | |

Before the Court are motions for partial summary judgment filed by both defendants on May 2, 2022, and May 23, 2022.  See Doc. Nos. 105 and 107.  The motions have been fully briefed and are ripe for consideration.  See Doc. Nos. 106, 108, 110, and 112.  For the reasons set forth below, the Land Board's motion for partial summary judgment is granted and the United States' motion for partial summary judgment is denied.

I.  **BACKGROUND**

This dispute stems from competing claims of mineral ownership due to a disagreement as to where the historic ordinary high-water mark ("OHWM") of the Missouri River is located.  In late 2016, Continental Resources Inc. ("Continental Resources") brought this interpleader action against the North Dakota Board of University and School Lands ("Land Board") and the United States in the District Court of McKenzie County, Northwest Judicial District, North Dakota.  Continental Resources is an oil and gas production company that leases minerals in western North Dakota from both North Dakota and the United States.  The Land Board consists of the

1

North Dakota Governor, Secretary of State, Superintendent of Public Instruction, Treasurer, and Attorney General.   The Land Board is charged with, among other things, managing North Dakota's minerals underlying sovereign lands.   Continental Resources requested the state court order North Dakota and the United States to interplead their respective claims to royalties from the production of minerals on lands which each claim to own and have issued leases with overlapping acreage.   The disputed minerals are described in an exhibit attached to Continental Resources' amended complaint.   See Doc. No. 27-1.   The United States removed the action to this Court on January 11, 2017.   Millions of dollars in royalties are at stake and the royalties continue to accrue.   Continental Resources does not claim an interest in any of the royalties.   It brings this Rule 22 interpleader action simply to avoid being subject to duplicate liability for royalty obligations attributable to the disputed lands.   Continental Resources is holding the disputed royalties in escrow at the direction of the Court, pending a final determination on the merits.

The Missouri River in North Dakota is a navigable river but not a state boundary.   In 1889, North Dakota was admitted to the Union and acquired title, pursuant to the equal footing doctrine, to the bed of the Missouri River, including the underlying minerals, up to the OHWM. To document the location of the Missouri River's OHWM, and thus delineate the boundary between state-owned riverbed and federally-owned uplands, the General Land Office (predecessor to the Bureau of Land Management "BLM") prepared and filed cadastral surveys between 1891 and 1901, using the Manual of Surveying Instructions in effect at the time.   The meander line identified in these surveys marked the OHWM at the time.

Rivers, especially large navigable rivers, such as the Missouri River, are dynamic.  They change course through erosion, accretion, and avulsion, and when they do the OHWM changes as well.  Rivers also flood and Missouri River flooding was particularly bad in the first half of the twentieth century.  So Congress passed the Flood Control Act of 1944, which authorized the United States Army Corps of Engineers ("Corps") to construct the Garrison Dam on the main stem of the Missouri River in North Dakota as part of the Pick-Sloan Missouri basin project dams.  Several other dams along the Missouri River were constructed as well.  The waters impounded by the Garrison Dam created Lake Sakakawea, one of the largest reservoirs in the United States.  Garrison Dam was completed in 1953.  Once the Garrison Dam was completed and Lake Sakakawea began to form, the portion of the Missouri River underlying Lake Sakakawea ceased its wanderings and the OHWM became fixed.  This fixed, but hotly contested, OHWM is known as the historic OHWM.

By the time construction of the Garrison Dam got underway, many of the uplands (lands above the OHWM) that would be inundated by Lake Sakakawea had been patented and passed from the federal public domain to private landowners.  Before the dam was constructed, the Corps surveyed the privately-owned land which was expected to be inundated and would need to be acquired by the United States.  The resulting survey maps are known as the "Corps Segment Maps."  The Corps Segment Maps depict the riverbed and OHWM as it existed in 1952.  Where the Corps was able to acquire the privately-owned lands that it needed through a voluntary sale, it allowed the landowners to reserve the underlying minerals.  However, where the Corps was forced to rely on the power of eminent domain, it acquired both the surface estate and the

associated mineral estate.  These lands which were acquired by the United States from private parties are referred to as "acquired lands."

Not all of the land inundated by Lake Sakakawea was owned by private parties.  Some of the land was owned by the United States.  At the time, the United States still held title to public domain uplands above the historic OHWM of the Missouri River that had never left the possession of the United States since they were acquired from France in 1803.  These lands, which have never been patented or left federal ownership, are referred to as "retained public domain lands" or "non-patented public domain lands" or simply "public domain lands."  As a result, the surface estate of the former uplands now submerged by Lake Sakakawea is owned by the United States and consists of a mix of "retained public domain lands" and "acquired lands."  The mineral estate in those former uplands consists of a mix of retained public domain mineral interests and acquired mineral interests which belong to the United States and mineral interests that remain in private ownership.  The State of North Dakota retains all the mineral interests underlying the riverbed up to the historic OHWM.

Prior to the Bakken oil boom which began around 2005, the exact location of the submerged riverbed was a question of only historical significance.  However, with the advent of modern oil and gas drilling technology, and Lake Sakakawea's location in the Bakken oil fields, the submerged riverbed's historic OHWM has taken on new importance.  The United States owns now submerged lands upland of the historic OHWM of the Missouri River.  Its interests extend down to the historic OHWM.  Pursuant to the equal footing doctrine, North Dakota owns the riverbed, including the mineral estate, up to the historic OHWM.  With the United States and North Dakota at odds over the location of the historic OHWM, more surveys were conducted.

In 2010, the Land Board hired a private engineering firm, Bartlett & West, to conduct a survey of the Missouri River. The final report was completed in 2011.[1] Bartlett & West conducted its analysis in compliance with Ordinary High Water Mark Delineation Guidelines issued by the North Dakota State Engineer in 2007. The study did not utilize the Corps Segment Maps. Since completion of the Bartlett & West study, the Land Board has leased North Dakota's mineral interests underlying the bed of the Missouri River consistent with the study's determination of the historic OHWM. Prior to the Bartlett & West study, North Dakota's minerals were leased based upon aerial photographs and ground surveys.

In 2013, the BLM prepared Supplemental Plats to reflect the OHWM of the retained public domain lands in the vicinity of Lake Sakakawea to account for the movement of the Missouri River between the original cadastral surveys conducted in the late nineteenth and early twentieth centuries and the impoundment of Lake Sakakawea in the 1950s. The Supplemental Plats do not address acquired lands. The Supplemental Plats do not show the boundary between state-owned riverbed and any other riparian property, whether privately held or federally acquired. The BLM determined the Corps Segment Maps were the most comprehensive evidence of the Missouri River's location just prior to impoundment and the best evidence of the historic OHWM relative to acquired lands. The Supplemental Plats were created by overlaying the Corps Segment Maps on the original turn of the century surveys. The Supplemental Plats show the official position of the United States as to the historic OHWM of the Missouri River prior to the formation of Lake Sakakawea. The Supplemental Plats show the boundary between the now submerged federal public domain uplands and State riverbed along portions of the

---

[1]The Bartlett & West report is available at:
https://www.land.nd.gov/sites/www/files/documents/Minerals/OHWM2/ohwm%20report.pdf.

Missouri River in North Dakota.  The BLM published the Supplemental Plats in late 2013 and early 2014.  North Dakota protested the Supplemental Plats because the BLM applied federal law rather than state law in making its OHWM determination.  The State contended the application of federal law led to an inaccurate OHWM boundary in the Supplemental Plats which resulted in some lands being shown as federally-owned uplands above the OHWM rather than state-owned riverbed below the OHWM.  The BLM rejected the protest.  North Dakota appealed.  The Interior Board of Land Appeals ("IBLA") rejected North Dakota's appeal, finding "[f]ederal law applies to BLM's determination of the OHWM along retained Federal riparian property, and state law should not be borrowed."  195 IBLA 194, 216 (March 25, 2020). This determination meant the boundary between state and retained federal lands would be determined as shown in the Supplemental Plats.

In April 2017, following the filing of this action and while the IBLA proceeding was pending, North Dakota enacted Chapter 61-33.1 of the North Dakota Century Code to address state ownership of the bed of the Missouri River.  In litigation with private mineral owners regarding lands whose surface estate had previously been sold to the United States to construct the Garrison Dam, the Land Board claimed "title to the bed of the Missouri River up to the current ordinary high water mark."  See Wilkinson v. Bd. of Univ. & School Lands, 903 N.W.2d 51, 54 (N.D. 2017) ("Wilkinson I") (emphasis added).  Chapter 61-33.1 rejected this view and made clear that "state sovereign land mineral ownership of the riverbed segments subject to inundation by Pick-Sloan Missouri Basin project dams extends only to the historical Missouri riverbed channel up to the ordinary high water mark."  N.D.C.C. § 61-33.1-02 (emphasis added); see also N.D.C.C. § 61-33.1-01 (defining "[h]istorical Missouri riverbed channel" as the riverbed

as it existed when the Pick-Sloan Plan dams were closed to begin impounding the Missouri River).

Section 61-33.1-03(1) provided that, for lands other than non-patented public domain lands, including the disputed acquired lands, the "Corps survey must be considered the presumptive determination of the ordinary high water mark of the historical Missouri riverbed channel," subject to a review process set forth in the statute.  N.D.C.C. § 61-33.1-03(1); see also N.D.C.C. § 61.33.1-01 ("'Corps survey' means the last known survey conducted by the army corps of engineers in connection with the corps' determination of the amount of land acquired by the corps for the impoundment of Lake Sakakawea and Lake Oahe, as supplemented by the supplemental plats created by the branch of cadastral survey of the United States bureau of land management").

For non-patented public domain lands owned by the United States, on the other hand, the OHWM of the historic Missouri River on these lands "must be determined by the branch of cadastral study of the United States bureau of land management in accordance with federal law."  N.D.C.C. § 61-33.1-06.  Chapter 61-33.1 is retroactive to the date of the closure of the Pick-Sloan dams save for the OHWM determination which is retroactive to all oil and gas wells spud after January 1, 2006, for purposes of oil and gas mineral and royalty ownership.  2017 N.D. Sess. Laws Ch. 426, § 4.

In Chapter 61-33.1, the North Dakota Legislature commissioned an additional study.  See N.D.C.C. § 61-33.1-03(2).  The study was completed by Wenck Associates, Inc. in 2018.[2]  The Wenck Report determination of the OHWM was made in accordance with the parameters set

---

[2]The Wenck Report is available at:
https://www.dmr.nd.gov/OrdinaryHighWaterMark/docs/2018-10-03_Amended_Final_OHWM_Report.pdf

forth in the enabling legislation.  See N.D.C.C. § 61-33.1-03(3).  The Bartlett & West Report OHWM determination is favorable to North Dakota, while the OHWM determination in the Supplemental Plats and Corps Segment Maps favors the United States.  The Wenck Report occupies the middle ground between the Bartlett & West Report and the Supplemental Plats and Corps Segment Maps in its determination of the OHWM.

Suffice it to say Chapter 61-33.1 proved controversial.  In January of 2018, a group of North Dakota taxpayers challenged the law, contending it was unconstitutional.  The plaintiffs' complaint alleged that Chapter 61-33.1 "unconstitutionally gives away State-owned mineral interests to 108,000 acres underneath the OHWM of the Missouri River/Lake Sakakawea, and above the Historic OHWM and gives away over $205 million in payments, in violation of the Constitution of the State of North Dakota." Sorum v. State, 947 N.W.2d 382, 388 (N.D. 2020). On July 30, 2020, the North Dakota Supreme Court issued an opinion finding Chapter 61-33.1 did not violate the North Dakota constitution's gift clause, watercourses clause, privileges or immunities clause, the local and special laws prohibition, and the public trust doctrine.  Id. at 390-400 (noting the State recognized in Chapter 61-33.1 that it had an obligation to pay its debts and deal fairly with its citizens).  On August 27, 2020, the North Dakota Supreme Court in Wilkinson v. Bd. of Univ. & School Lands, 947 N.W.2d 910, 920-21 (N.D. 2020) ("Wilkinson II") found Chapter 61-33.1 was not ambiguous and applied to the land in question which was above the OHWM of the historical Missouri riverbed channel and was not state sovereign lands. The case was remanded to the state district court for a determination of damages on the royalties the state had unfairly claimed.  Id. at 920.

The partial motions for summary judgment now before the Court pertain only to the "acquired lands" which are those lands that left federal ownership and were later reacquired by the United States from private parties. The Court previously issued a ruling pertaining to the non-patented public domain lands finding that while federal law governed, federal law borrowed state law as the rule of decision, and the relevant State law adopted the BLM's Supplemental Plats as delineating the historical OHWM. See Doc. No. 92.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id. The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of

a genuine issue of material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir.

2011).  The non-moving party may not rely merely on allegations or denials in its own pleading;

rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ.

P. 56(c)(1).  If the record taken as a whole and viewed in a light most favorable to the

non-moving party could not lead a rational trier of fact to find for the non-moving party, there is

no genuine issue for trial and summary judgment is appropriate.  Matsushita, 475 U.S. at 587.


## III.   LEGAL DISCUSSION

The pending motions for partial summary judgment present three closely related issues as

to the disputed acquired lands: (1) the first issue is whether state law or federal law governs the

determination of the historical OHWM; (2) if the answer to the first question is that federal law

applies then the second question that must be addressed is whether federal law borrows state law

as the rule of decision; and (3) the third issue is the applicability of N.D.C.C. Ch. 61-33.1 to the

disputed acquired lands.  The Court previously addressed the status of the public domain lands

which are not at issue in the current motions.  See Doc. No. 92.  The Court will address each

question in turn.


### A.   CHOICE OF LAW

The United States contends federal law must be applied in order to determine the OHWM

of the historic Missouri River abutting the disputed acquired lands.  The Land Board contends

state law governs the determination.

Under the equal footing doctrine, upon statehood, States acquire absolute title "to the beds of waters then navigable" within their borders.  See PPL Montana, LLC v. Montana, 565 U.S. 576, 591 (2012).  Such was the rule for the thirteen original States and all subsequent States as coequals under the Constitution.  Id.  All States hold "absolute right to all their navigable waters and the soils under them."  Id. at 590.  State title to these lands is "conferred not by Congress but by the Constitution itself."  Id. at 591.  Since title is conferred to the States by the Constitution itself, no Congressional land grant to a third party can defeat State title.  Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 374 (1977).  In Corvallis, the Supreme Court held that state law should be applied to determine whether Oregon or an Oregon corporation owned certain portions of the riverbed of the Williamette River.  Id. at 365. The United States Supreme Court explained that the initial boundary between the riverbed and the uplands is determined by federal law.  Id. at 370-71.  But "thereafter the role of the equal-footing doctrine is ended, and the land is subject to the laws of the State" "unless there were present some other principle of federal law requiring state law to be displaced."  Id. at 376, 371. This general rule from Corvallis does not apply where the "United States has never yielded title or terminated its interest."  Wilson v. Omaha Indian Tribe, 442 U.S. 653, 670 (1979).  The Supreme Court rejected the idea that because land had originally been patented by the United States federal law continued to apply.  Corvallis, 429 U.S. at 372.

In this case, there is no dispute that title to the acquired lands has passed out of federal hands and into private hands and then was reacquired by the United States.  Whenever "title shall have passed, then that property, like all other property in the state, is subject to state legislation."  Corvallis, 429 U.S. at 377.  Once title passes under the equal footing doctrine,

"state law governs subsequent dispositions." Id. at 378.  Thus, State law must be applied in this case to determine the historical OHWM as to the acquired lands in question.

The contention of the United States that federal law should govern this determination relies upon the Supreme Court's opinion in *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 283 (1982).  *California ex rel. State Lands Comm'n,* involved a suit by California to quiet title in oceanfront land created by accretion to land owned by the United States.  Id. at 275.  The central issue was whether state law or federal law governed the determination.  The construction of two jetties and resulting accretion had caused one hundred eighty-four acres of upland to be created by the seaward movement of the OHWM of the Pacific Ocean.  Id. at 275-76.  Citing *Wilson*, the Supreme Court found federal law applied because the case involved "a dispute over accretions to oceanfront land where title rests with or was derived from the Federal Government."  Id. at 283.  The Supreme Court went on to hold that the case was not one where state law should be borrowed as the rule of decision because a federal statute controlled the determination.  Id. at 283.  The Supreme Court explained that a provision of the federal Submerged Lands Act withholding accretions to coastal lands from grants to the States meant "borrowing for federal-law purposes a state rule that would divest federal ownership is foreclosed."  Id. at 283-84.  *Wilson* was distinguished because that case involved "no special federal concerns, let alone a statutory directive," which required a federal common-law rule.  Id. at 284.

The Court finds *California ex rel. State Lands Comm'n* is easily distinguishable and of little precedential value to the present case.  The dispute involved the accretion of oceanfront property to which the United States had never yielded title, application of a relevant federal

statute (the Submerged Lands Act), and the special nature of a coastal boundary. The present case does not involve any of these circumstances. *California ex rel. State Lands Comm'n* did not involve land to which the United States yielded title and then reacquired, the equal footing doctrine, or the historical OHWM of a submerged riverbed of a navigable river. The Court concludes as a matter of law that *Corvallis,* rather *California ex rel. State Lands Comm'n,* controls the determination of whether state law or federal law applies to the acquired lands at issue in this case. Even if the Court agreed with the United States that federal law controls, the Court would find, for all of the reasons set forth in the Court's prior order relating to the non-patented public domain lands, that state law supplies the rule of decision. See Doc. No. 92, pp. 13-16; see also Wilson, 442 U.S. at 672 (finding state law should be borrowed as the federal rule of decision and questions of land ownership within or adjacent to the Missouri River are best settled by reference to state law "even where Indian trust land, a creature of federal law, is involved").

### B.      STATE LAW

This case is an interpleader action related to a boundary dispute. The United States and North Dakota have made competing demands against Continental Resources to the royalties from certain tracts of land described in an attachment to Continental's amended complaint. See Doc. No. 27-1. This boundary dispute can only be settled by deciding whether state law or federal law applies to determine the historic OHWM of the Missouri River relative to the disputed tracts of land. The Court has determined state law applies as to the "acquired lands."

The more pressing question is exactly what state law applies?  The United States contends that any application of State law should be limited to state substantive law.  The Land Board contends state substantive law applies, including the judicial and administrative processes described in Chapter 61-33.1 of the North Dakota Century Code.  This is not a Quiet Title action or declaratory judgment action.  The federal court would clearly have jurisdiction over any such dispute.  Wilson, 442 U.S. at 673-74.  The Court's determination in this interpleader action is limited to the disputed lands and royalties as listed in the amended complaint and the competing liens claimed by the United States and the State of North Dakota.  See Doc. No. 27.  The competing determinations as to the disputed royalties have already been made.  Under state law, that determination was made by the Wenck Report.  Had the Court determined federal law applied, the royalties would be allocated based upon the Corps Segment Maps.[3]  There has been no suggestion by the United States in this interpleader action that the application of state substantive law as reflected in the Wenck Report was incorrect or unfair.  The Court finds as a matter of law that state substantive law applies to determine the historical OHWM relative to the acquired lands as set forth in the Wenck Report.

IV.   **CONCLUSION**

Accordingly, the Land Board's motion for partial summary judgment (Doc No. 105) is **GRANTED** and the United States' motion for partial summary judgment (Doc. No. 107) is

---

[3]It is important to remember that the 2013 Supplemental Plats only address the non-patented public domain lands and do not address the acquired lands.  This leaves the 1952 Corps Segment Maps as the best federal evidence of the historical OHWM as to the acquired lands.  North Dakota law in Ch. 61-33.1 adopted the Supplemental Plats as the historical OHWM in relation to the non-patented public domain lands while commissioning the Wenck Report for a determination relevant to the acquired lands.  The curious failure of both the United States and North Dakota to file a Quiet Title action leaves us where we are today.

**DENIED**.  The Court **ORDERS** and **DECLARES** the royalties on the acquired lands in dispute must be distributed based upon the determination of the historic OHWM of the Missouri River as determined by the substantive law of the State of North Dakota as set forth in the Wenck Report.

   **IT IS SO ORDERED**.

   Dated this 21st day of March, 2023.

            */s/ Daniel L. Hovland*
            Daniel L. Hovland, District Judge
            United States District Court